[Cite as *Hall v. Hall*, 2018-Ohio-4453.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
SANDUSKY COUNTY

Cleadis Hall

Court of Appeals No. S-18-011

    Appellant

Trial Court No. 16DR99

v.

Shirley Hall

**DECISION AND JUDGMENT**

    Appellee

Decided: November 2, 2018

* * * * *

Joseph F. Albrechta, John A. Coble, and George J. Schrader, for appellant.

Lisa M. Snyder, for appellee.

* * * * *

**OSOWIK, J.**

{¶ 1} This is an appeal from a judgment of the Sandusky County Court of

Common Pleas, Domestic Relations Division, which granted the parties a divorce and

determined the separate property classification of disputed funds. For the reasons set forth below, this court affirms the judgment of the trial court.

{¶ 2} On February 8, 2016, plaintiff-appellant Cleadis Hall (hereafter "Mr. Hall") filed a complaint for divorce against defendant-appellee Shirley Hall (hereafter "Mrs. Hall") after nearly 40 years of marriage. Mr. Hall alleged incompatibility with Mrs. Hall. On March 2, 2016, Mrs. Hall answered the complaint and counter-claimed for divorce alleging "gross neglect of duty and extreme cruelty." The parties were married on August 12, 1978, and separated on February 8, 2016, the date of Mr. Hall's divorce filing. Their "relationship deteriorated in December of 2015," prior to the separation, when Mrs. Hall alleged a domestic violence incident by Mr. Hall. Following a period of discovery and mediation, evidentiary hearings were held on May 17, 2017, and on January 3, 2018. As journalized on February 22, 2018, the trial court filed a decision and judgment entry granting the parties a divorce due to incompatibility and determined, among other matters, certain disputed funds as the separate property of Mrs. Hall, of which Mr. Hall received none.

{¶ 3} Mr. Hall sets forth two assignments of error:

I. The trial court erred by finding that Mrs. Hall possessed $36,500.00 in separate funds arising from a wrongful death settlement.

II. The trial court erred in finding that alleged gift of Mrs. Hall's children was separate property.

{¶ 4} We will address the assignments of error together.

2.

## A. Separate Property Classification

{¶ 5} Neither party disputes in a divorce proceeding the trial court is required to determine what constitutes marital property and separate property. R.C. 3105.171(B).

{¶ 6} "Marital property" is not "separate property." R.C. 3105.171(A)(3)(b). "Separate property" is defined as "all real and personal property and any interest in real or personal property that is found by the court to be any of the following," including, "Any real or personal property or interest in real or personal property that was acquired by one spouse prior to the date of the marriage." R.C. 3105.171(A)(6)(a)(ii). "Separate property" also includes, "Compensation to a spouse for the spouse's personal injury, except for loss of marital earnings and compensation for expenses paid from marital assets." R.C. 3105.171(A)(6)(a)(vi). "Separate property" also includes, "Any gift of any real or personal property or of an interest in real or personal property that is made after the date of the marriage and that is proven by clear and convincing evidence to have been given to only one spouse." R.C. 3105.171(A)(6)(a)(vii).

{¶ 7} Further, "The commingling of separate property with other property of any type does not destroy the identity of the separate property as separate property, except when the separate property is not traceable." R.C. 3105.171(A)(6)(b).

{¶ 8} We review a trial court's factual findings on the classification of marital and separate property pursuant to R.C. 3105.171 under a manifest weight of the evidence standard. *Okos v. Okos*, 137 Ohio App.3d 563, 569-570, 739 N.E.2d 368 (6th Dist.2000), citing *Barkley v. Barkley*, 119 Ohio App.3d 155, 159, 694 N.E.2d 989 (4th Dist.1997).

3.

Consequently, we will not reverse the trial court's decision if it is supported by some competent and credible evidence. *Hook v. Hook*, 189 Ohio App.3d 440, 2010-Ohio-4165, 938 N.E.2d 1094, ¶ 18 (6th Dist.), citing *Schober v. Schober*, 6th Dist. Ottawa No. OT-08-061, 2009-Ohio-4408, ¶ 27. Competent evidence is admissible evidence for the purpose of proving a relevant fact. *In re Meeks*, 11th Dist. Lake No. 95-L-050, 1995 Ohio App. LEXIS 4369, *13-14 (Sep. 29, 1995), citing 29 American Jurisprudence 2d, Evidence, Section 257 at 307-308 (1995). Credible evidence means evidence found worthy of being believed. *See State v. Stone*, 6th Dist. Sandusky No. S-06-026, 2007-Ohio-752, ¶ 20.

{¶ 9} The burden of proof is generally on the party seeking to have the property declared separate by a preponderance of the evidence standard to trace the asset to separate property. *Hook* at ¶ 19, citing *Okos* at 570. However, where the separate property being proven is pursuant to R.C. 3105.171(A)(6)(a)(vii), the burden of proof is clear and convincing evidence. Clear and convincing evidence means "that degree of proof which will provide in the mind of the trier of fact a firm belief or conviction as to the facts sought to be established." *Hook* at ¶ 19, quoting *Barkley* at 168-169. "Clear and convincing evidence" is more than a mere preponderance of the evidence but less than the certainty required for "beyond a reasonable doubt" in criminal cases. *State ex rel. Cincinnati Enquirer v. Deters*, 148 Ohio St.3d 595, 2016-Ohio-8195, 71 N.E.3d 1076, ¶ 19, citing *Cross v. Ledford*, 161 Ohio St. 469, 471, 120 N.E.2d 118 (1954), paragraph three of the syllabus.

4.

{¶ 10} We will not reweigh the evidence introduced to the trial court; rather, we will uphold the findings of the trial court if the record contains some competent and credible evidence to support the trial court's conclusions. *Fletcher v. Fletcher*, 68 Ohio St.3d 464, 468, 628 N.E.2d 1343 (1994), citing *Ross v. Ross*, 64 Ohio St.2d 203, 204, 414 N.E.2d 426 (1980).

{¶ 11} In support of his first assignment of error, Mr. Hall argued Mrs. Hall withdrew $36,500 in cash from undisclosed bank accounts in December 2015 that "were held, concealed and disbursed during the term of the marriage" making them marital property pursuant to R.C. 3105.171(A)(3). Mr. Hall further argued Mrs. Hall failed to meet her burden with clear and convincing evidence the money was not for loss of consortium for personal injuries suffered by her first husband pursuant to R.C. 3105.171(A)(6)(a)(vi). Mr. Hall further argued Mrs. Hall did not trace the money to prior to their marriage as originating from the deaths of her previous husband and son pursuant to R.C. 3105.171(A)(6)(a)(ii), because she and her children were not credible and did not provide any documentary evidence.

{¶ 12} In support of his second assignment of error, Mr. Hall argued the trial court erred by applying the "wrong [preponderance] standard of evidence" to the gifts from her children rather than the higher clear and convincing evidence standard of review required by R.C. 3105.171(A)(6)(a)(vii). Mr. Hall argued Mrs. Hall's evidence was murky at best and far from meeting the standard of clear and convincing evidence.

5.

{¶ 13} In response to both assignments of error, Mrs. Hall argued the trial court did not commit any error. Mrs. Hall argued the $36,500 in dispute was derived from $40,000 comprised as follows: (1) gifts of $10,000 from each of her three surviving children, and (2) an additional $10,000 from "the proceeds remaining from a certain wrongful death actions involving Appellee's first husband and a child of that relationship." Mrs. Hall argued she met her burden of proof of preponderance of the evidence to show the $36,500 in dispute was separate property acquired prior to the marriage pursuant to R.C. 3105.171(A)(6)(a)(ii). Mrs. Hall further argued she met her burden of proof by clear and convincing evidence to show $30,000 of the total amount in dispute was separate property pursuant to gifts from her three surviving children pursuant to R.C. 3105.171(A)(6)(a)(vii).

{¶ 14} Applying the appropriate legal standard is a question of law, which we review on a de novo basis. *Arnott v. Arnott*, 132 Ohio St.3d 401, 2012-Ohio-3208, 972 N.E.2d 586, ¶ 13.

{¶ 15} The record shows the May 17, 2017 hearing concluded with the parties agreeing to all matters except for one. To resolve the dispute, they agreed to additional time for Mrs. Hall to prove the tracing of "approximately 38 to $40,000 * * * for which [Mrs. Hall] is asserting a separate property interest by gifts from her children." The trial court concurred with that approach as reflected in its June 21, 2017 journalized judgment entry:

6.

The parties have hereby entered and read onto the record an agreement on all issues relating [to] the marriage but for one. That issue being the marital or separateness of some $36,500.00 that was deposited and withdrawn from Defendant's Fremont Federal Credit Union account between October 2015 and December 2015. Upon agreement of the parties and of the Court, Counsel for Defendant shall submit to Counsel for Plaintiff all documents in Defendant's possession regarding the tracing of the $36,500.00 in the Fremont Federal Credit Union account. Should the parties not reach an agreement regarding the reserved issue within thirty (30) days, the matter shall be set for final hearing on that sole issue.

{¶ 16} The record contains affidavits filed on June 14, 2017, from Mrs. Hall and her three surviving adult children, Shirley Marie Zeigler, Mary Denise Dennis and Rodney Sharp, regarding the tracing of the funds in dispute. A fourth adult child, Jeannie, "passed away from cancer during the pendency of the divorce."

{¶ 17} Mrs. Hall averred in her affidavit dated June 5, 2017, that following the December 2015 domestic violence incident involving Mr. Hall, she:

[E]xpressed concern to my four children about my financial stability if Mr. Hall and I were divorced. Around this time, my children offered to contribute funds sufficient for me to pay off the mortgage on our Clyde residence and attorney fees to my lawyer for the divorce action. I had previously gifted to my children certain funds I received from wrongful

7.

death claims involving their father and brother. My children gifted back to me some of those funds as follows: (a) Shirley Marie Zeigler the sum of $10,000.00; (b) Mary Denise Dennis the sum of $10,000.00; and (c) Rodney Sharp [the] sum of $10,000.00. * * * In December 2015, Mr. Hall started to move funds from our accounts without my knowledge or consent. I was able to secure the sum of $10,000.00 from a bank account that I moved into my individual name which offset the cash that Mr. Hall took when we separated. Mr. Hall admitted to taking the cash and never objected to my making the withdrawal, presumably because he had already taken more than his share. This was before the divorce was filed. The funds I received from my children were gifted from my children for my financial stability and are to be considered a gift in consideration of the circumstances. There is no obligation for me to repay my children these sums. I took the $30,000.00 received from my children, plus the $10,000.00 that I had from my separation from Mr. Hall, and invested the $40,000.00 in a Certificate of Deposit at Croghan Colonial Bank. Copies of the receipts for the deposits for the CD are attached hereto. The funds are still on deposit as security for the payment of my mortgage and my attorney fees.

{¶ 18} Shirley Marie Zeigler and Marie Denise Dennis each averred in affidavits dated June 5, 2017, that she gifted $10,000 to Mrs. Hall from funds Mrs. Hall had previously given her from a wrongful death settlement involving her biological father:

[F]or my mother's stability and her sole benefit [to payoff the mortgage secured by the residence in which she is residing and to retain an attorney to represent her in a divorce proceeding] to the exclusion of Mr. Hall. * * * The funds transferred are to be considered a gift to my mother in consideration of the circumstances. There is no obligation for my mother to repay the funds to me nor do I intend the funds to benefit Mr. Hall in any way.

{¶ 19} Rodney Sharp, Mrs. Hall's surviving son living in Arkansas, averred in his affidavit dated May 30, 2017, "I Rodney Sharp gave my mother Shirley Hall ten thousand dollars $10,000 on December 26, 2015."

{¶ 20} It is undisputed in the record that prior to their 1978 marriage, the parties had each previously been married with children. Mrs. Hall testified at the January 3, 2018 hearing that prior to her marriage to Mr. Hall she received two separate wrongful death settlements, first for her son and then for her first husband. The exact amount of wrongful death proceeds received by Mrs. Hall prior to her marriage to Mr. Hall is not clear in the record. Mrs. Hall testified, "I got that [money] 20 years ago when my son died, and the first money I got when my husband died, my first husband." Later, Mrs. Hall clarified the money from the two wrongful death settlements was used by her to

9.

support the family for the 13 years between the death of her first husband and her marriage to Mr. Hall. At some point previously she gave some of the wrongful death settlement money to her children, and this was the money with which they offered to help, starting in December 2015. Mrs. Hall testified she received a total of $30,000 from her children and added $10,000 from her own bank account to deposit $40,000 into a new savings account at a different bank.

{¶ 21} Much time was spent by Mr. Hall's counsel to find originating bank deposits to dispute the testimony from Mrs. Hall and her daughters the wrongful death settlement money sat for decades as cash in safes. In response to questions about bank deposits, Mrs. Hall replied, "I don't know what you're talking about, sir. You got me confused." Previously, Mrs. Hall had testified, "They – both – well, my daughters both had them in their safes, I think, ask them." The final $10,000 deposited into the new savings account was from her own, separate account: "* * * and I got my 10 out of mine, and I put it in." It took from December 2015, to February 2016, for her children to give her their $30,000 in cash. Then Mrs. Hall added her own $10,000 to total $40,000, all cash. Mrs. Hall then requested a $40,000 cashier's check from the first bank to then deposit $40,000 into the new bank account at Croghan Colonial Bank, referred to as her "safety net" due to the impending divorce: "That's the way the man said it would be the best way to do it." Mrs. Hall testified the names on the new $40,000 account were hers and her children's: "Their names are right on the account. * * * All three of their names are on it, too * * * not just mine."

10.

{¶ 22} Mrs. Hall's daughter, Mary Denise Dennis, testified at the January 3, 2018 hearing as to the origin of her $10,000 cash gift to her mother around December 2015. The money originated from the deaths of her father and young brother: "Well * * * when we were young, * * * my dad passed away and my brother passed away, so my mom gave us each $5,000 apiece * * * so I kept that in my safe." Later, Mrs. Dennis testified she received an additional $5,000 cash gift from her mother from the wrongful death settlements. Each time Mrs. Dennis put the cash in her safe. The intent of the full $10,000 cash gift was for her mother "to pay off the house." Although Mrs. Dennis testified, "I'm not good at bank things," she said when her mother deposited $40,000 into the new bank account, Mrs. Hall had all three children's names on the account: "[It] was in all our kids' names so that she would make sure it came back to us if anything happened to her." Mrs. Dennis confirmed her mother did not have to pay back the $10,000 gift.

{¶ 23} Mrs. Hall's other surviving daughter, Shirley Zeigler, also testified at the January 3, 2018 hearing as to the origin of the $10,000 cash gift to her mother around December 2015:

> [S]he gave us money from our dad passing away, my brother passing away, and it was, like, now she needed help. We never needed help, she just gave it to us, 'cause it was my brother and my dad. * * * My mom has always been there when you needed her, and that's why [my sister, brother and I] said, you know, she gave us the $10,000. We didn't want her to lose

her house, 'cause she wouldn't be able to make the payments [because of the impending divorce].

{¶ 24} Mrs. Zeigler testified she gave her mother $10,000 "cash, out of the safe." Mrs. Zeigler and her husband always kept the cash in a safe at the home "so we didn't have to go to the bank and borrow money all the time." Mrs. Zeigler also testified that when her mother deposited $40,000 into the new bank account, Mrs. Hall opened the account in her own name and "put if anything was to happen to her * * * we [three children] all will make sure the house gets paid off first and then whatever after that would be ours." Mrs. Zeigler also confirmed her mother does not have to pay back the $10,000 gift.

{¶ 25} In its January 16, 2018 journalized judgment entry entitled, "Decision re Separate Property," the trial court stated as a result of the January 3, 2018 hearing:

> Testimony was provided by Defendant and her two daughters, Mary Dennis and Shirley Zeigler. * * * Documentary evidence was admitted establishing balances and transfers from various account[s] during the time in questions [sic]. Defendant had accounts with the Fremont Federal Credit union jointly with her daughter, Shirley Zeigler. Defendant's testimony was that these monies had their origin in two wrongful death settlements involving her former husband, and son. Her attorney at the time * * *advised her to, in essence, save the money for a rainy day. With the divorce, her rainy day had arrived as she would need about $30,000.00 to

12.

pay off the mortgage on her house, and since she only received $623.00 a month in social security, she would need help from her children to do so. Mary Dennis and Shirley Zeigler each testified that they accompanied Mom to the Croghan Colonial branch bank in Green Springs to purchase cashier's checks, that they each contributed $10,000.00 to do so, and that their brother also contributed $10,000.00. A fourth sibling who was prepared to also contribute died of cancer about that time, thus no contribution from her. The additional $10,000.00 in cashier's checks was paid in by the Defendant. * * * While she did provide information to her attorney to insert into the Property disclosure affidavit, there was no information provided regarding the cashier's checks. The Court finds it reasonable for Defendant to have assumed that since she had always maintained the monies separately from the Plaintiff husband, and in fact held them jointly with her daughter Shirley, that these monies would not be a consideration in the divorce proceeding. And, it appears that the Plaintiff retained moneys that he considered separate * * *. The $10,000.00 was not disclosed on his affidavit. In any event, the parties negotiated a settlement of the property issues with each party having an understanding of the assets to be divided.

The Court is persuaded by a preponderance of the evidence that the monies in question have been properly traced as having been $30,000.00 in

contributions from her three children to help her pay off her mortgage, and $36,500.00 from monies held jointly by her with daughter Shirley Zeigler and having its origin as wrongful death settlements from her previous husband and son.

The Court finds said monies to be the separate property of the Defendant wife, not part of the marital estate.

{¶ 26} In its January 30, 2018 journalized findings of fact and conclusions of law, the trial court reaffirmed the findings set forth in its January 16, 2018 journalized judgment entry and made the following additional findings:

Additionally, the court finds that at no time did the Defendant possess $79,000.00 plus change in separate funds as suggested by the questioning of Plaintiff's counsel. * * * That the Plaintiff [sic] was credible, as were her daughters who also testified, and that her actions were consistent with the way a spouse in a second marriage would most likely conduct his or herself, i.e. as to how assets were held. Specifically, that she retained control over her funds at the Fremont Federal Credit Union by titling them in the name of herself and daughter Shirley Zeigler, and not her husband. No evidence was presented to suggest that Defendant ever commingled her FFCU monies with marital funds, nor that she gifted said monies to Plaintiff.

14.

**{¶ 27}** In its February 23, 2018 journalized judgment entry of divorce, the trial court found, "That an evidentiary hearing was conducted on January 3, 2018, with a Decision re Separate Property issuing January 10, 2018, FINDING (emphasis sic.) Defendant met the burden of establishing her separate property claim." Among the trial court's orders was, "Each party is awarded, free and clear of any claims of the other, all bank accounts presently held individually in his or her respective name. The parties represent that there are no joint accounts in existence as of the date of final hearing herein."

**{¶ 28}** Our de novo review of the legal standards reaches the same outcomes as the trial court because the record contains some competent and credible evidence to support the separate property determinations. There is some competent and credible evidence supporting the disputed $36,500 is Mrs. Hall's separate property derived, by clear and convincing evidence, in part from the donative intent of each of Mrs. Hall's three children gifting her $30,000 in total. *Kovacs v. Kovacs*, 6th Dist. Sandusky No. S-09-039, 2011-Ohio-154, ¶ 12-15; R.C. 3105.171(A)(6)(a)(vii). In addition, there is some competent and credible evidence supporting the disputed $36,500 is separate property derived, by the preponderance of the evidence, in part from the pre-marital origin of the final $10,000 (to reach $40,000) obtained by Mrs. Hall from her own account, R.C. 3105.171(A)(6)(a)(ii), and never comingled with Mr. Hall or other marital funds, R.C. 3105.171(A)(6)(b).

15.

**{¶ 29}** Further, even if we interpreted the amount in dispute as being for $36,500 plus $30,000, for a total of $66,500, there is some competent and credible evidence in the record to support the trial court's determination by a preponderance of the evidence "at no time did the Defendant possess $79,000.00 plus change in separate funds as suggested by the questioning of Plaintiff's counsel" because the trial court reviewed "the account statements introduced into evidence from Fremont Federal Credit Union, Croghan Colonial Bank, Old Fort Bank, and Impact Credit Union." The trial court found at all times Mrs. Hall "retained control over her funds at the Fremont Federal Credit Union [the focus of Mr. Hall's assertions] by titling them in the name of herself and daughter Shirley Zeigler, and not her husband."

**{¶ 30}** We also find that Mrs. Hall met her burden to show all of the elements of inter vivos gifts from her children to support the determination of $30,000 as separate property pursuant to R.C. 3105.171(A)(6)(a)(vii). In order for Mrs. Hall's three surviving children to make inter vivos gifts of $10,000 each, Mrs. Hall must show by clear and convincing evidence: (1) the donor's intent to make the gift to her, (2) delivery of the gift to her, (3) the donor's relinquishing ownership, dominion or control over the gift, and (4) her acceptance of the gift. *Kovacs* at ¶ 12, citing *Barkley*, 119 Ohio App.3d 155, at fn. 2, 694 N.E.2d 989. The record contains evidence that each child voluntarily made the $10,000 cash gifts to their mother with no expectation of any repayment because of their desire to help their mother through the difficult period of a divorce and to keep her home, which Mr. Hall had vacated. None of the cash gifts were for Mr. Hall.

16.

Mrs. Hall accepted the cash donations, contributed her own funds, turned the cash into cashier's checks, and then opened a new bank account with the $40,000 she assembled. Although there was some testimony that the three children's names were also on the Croghan Colonial Bank account, further testimony clarified they were not primary names on the account but, instead, beneficiaries in the event of something happening to Mrs. Hall. While it may be unusual for people today to deal with so much cash or cashier's checks, as the trial court explained, "her actions were consistent with the way a spouse in a second marriage would most likely conduct his or herself, i.e. as to how assets were held."

{¶ 31} We also find Mrs. Hall met her burden by a preponderance of the evidence to show the remaining $6,500 of the $36,500 in dispute are traceable to wrongful death settlements occurring prior to her marriage to Mr. Hall. The record shows Mrs. Hall had "her own account," and it is undisputed that account was never comingled with other marital funds and was not used for marital expenses. Mr. Hall concedes, "She has admitted to concealing $40,000 in undisclosed moneys, of which she is claiming only $10,000.00 came from her own funds." Mr. Hall does not challenge "$10,000.00 came from her own funds." Mr. Hall questions the basis of how Mrs. Hall's wrongful death settlement money relates to her loss of consortium because "no evidence was offered into the record regarding the size of the award, the amount attributable to loss of consortium, where the funds were stored, what funds were consumed since the day they were received, or any other information helpful to tracing them apart from the bare assertion

17.

by Mrs. Hall that, at one point in time, she got money from a wrongful death settlement." We find Mr. Hall's reliance on R.C. 3105.171(A)(6)(a)(vi) to be misplaced because the record contains some competent, credible evidence Mrs. Hall's wrongful death settlement money can be traced to at least 13 years before her marriage to Mr. Hall. Mr. Hall urged us to find "her inherently less credible witness testimony" that "sharply contradicted" bank records. We will uphold the findings of the trial court, which was not persuaded by Mr. Hall's logic or math to support this claim.

## B. Division of Separate Property

{¶ 32} Even if we interpreted the issues on appeal brought by Mr. Hall as being a challenge to the lack of division of Mrs. Hall's separate property, we do not find the trial court abused its discretion. We review a trial court's division of marital and separate property for an abuse of discretion. *Kunkle v. Kunkle*, 51 Ohio St.3d 64, 67, 554 N.E.2d 83 (1990), citing *Holcomb v. Holcomb*, 44 Ohio St.3d 128, 131, 541 N.E.2d 597 (1989). Abuse of discretion "'connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable.'" *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983), quoting *State v. Adams*, 62 Ohio St.2d 151, 157, 404 N.E.2d 144 (1980). "An unequal property division does not, standing alone, amount to an abuse of discretion." *Enriquez v. Enriquez*, 6th Dist. Lucas No. L-94-252, 1995 Ohio App. LEXIS 5362, *18 (Dec. 8, 1995), citing *Cherry v. Cherry*, 66 Ohio St.2d 348, 352, 421 N.E.2d 1293 (1981), paragraph two of the syllabus.

18.

{¶ 33} In this case the parties reached agreements on all financial matters pertaining to the divorce, except for Mrs. Hall's bank accounts. We find Mr. Hall's assertions Mrs. Hall engaged in financial misconduct with respect to "undisclosed bank accounts * * * held, concealed and disbursed during the term of the marriage" are misplaced, and Mr. Hall failed to meet his burden. *Epperson v. Epperson*, 6th Dist. Wood No. WD-14-054, 2015-Ohio-2443, ¶ 40, citing *Lindsay v. Lindsay*, 6th Dist. Sandusky No. S-11-055, 2013-Ohio-3290, ¶ 21. The trial court found Mrs. Hall's failure to include the $40,000 held at Croghan Colonial Bank in the "Separate Property" section of her affidavit of property pursuant to R.C. 3105.171(E)(3) was "excusable neglect due to her age, confusion due to her medical issues at the time, and anxiety over how her house mortgage was going to be paid." We do not find the trial court abused its discretion with those findings. *See* R.C. 3105.171(E) and (F); *see also Epperson* at ¶ 40, citing *Thomas v. Thomas*, 2012-Ohio-2893, 974 N.E.2d 679, ¶ 63 (5th Dist.) ("financial misconduct" allegations requires looking to the reasons behind and results of the wrongful activity). Nor do we find the trial court abused its discretion when it ordered each party "is awarded, free and clear of any claims of the other, all bank accounts held individually in her or her respective name." *See Lindsay* at ¶ 22.

### C. Conclusion

{¶ 34} Since we find there was some competent and credible evidence to support the trial court's determination that $30,000 of the $40,000 at Croghan Colonial Bank were gifts from Mrs. Hall's children, and the remaining $10,000 was from Mrs. Hall's

19.

own funds, we cannot find the trial court's judgment "on the marital or separateness of some $36,500.00 that was deposited and withdrawn from Defendant's Fremont Federal Credit Union account between October 2015 and December 2015" as Mrs. Hall's separate property was against the manifest weight of the evidence.

**{¶ 35}** Mr. Hall's first and second assignments of error are not well-taken.

**{¶ 36}** The judgment of the Sandusky County Court of Common Pleas, Domestic Relations Division, is affirmed. Appellant is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.


Mark L. Pietrykowski, J.                      _____
                                              JUDGE

Thomas J. Osowik, J.                           _____

James D. Jensen, J.                             JUDGE
CONCUR.

                                                     _____
                                              JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.